at all, Mr. Bernal, and Mr. Goldberger, take your time setting up. I'm here on behalf of appellants in this case, Superintendent of SCI Houtzdale, Ken Cameron, and Monroe County District Attorney's Office at all. I respectfully request that two minutes be reserved for rebuttal. Your Honor, we're here today on two issues with regard to this case, the first obviously being jurisdiction. That was referred to the merits panel by order of the court. It's my understanding that there has been argument obviously advanced by the appellees in this matter that the filing of the notice of appeal was late due to the manner in which it was filed. That was by first class mail by appellants. I didn't talk to the other two judges about this, but frankly, I wouldn't beat this. Yeah, I think I would go on to your second argument. Yes, Your Honor, thank you. Your Honor, with regard to the second argument, it is the appellant's position that there is overwhelming evidence presented at trial apart from which has been conceded by appellants in previous proceedings in this case and by the ruling of the district court to support the jury verdict in this matter. Your Honor, the fire evidence is largely discredited, is that correct? That's correct, Your Honor. So you're now relying, is the gas chromatography evidence, has that been discredited as well? It has, Your Honor. That was the ruling from Magistrate Houtzdale. So the two big things that they relied on at trial, scientific fire evidence as to who started the fire, and gas chromatography is out, so what is left in? Your Honor, it would be the appellant's contention in this case that there are still two primary pillars of evidence that do stand and support the jury's verdict. That would be the independent forensic analysis that does not include the fire science or the gas chromatography, and other things that a jury could rely upon with regard to Mr. Lee's demeanor, behavior, and evidence, excuse me, independent evidence that contradicted his version of the events that was given to the officers and by the witness for the defendant at trial, Reverend Soome. With regard to the first pillar that I referred to, Your Honor, is the independent forensic evidence. Let me just, before we get into that, what is our standard of review for the merits here? Your Honor, the appellant had advanced an argument in its brief that the standard is harmless error beyond a reasonable doubt. I understand that appellees did make a counterargument to that effect, that there is in fact a It should be plain error is what they've argued. Yes, Your Honor. And the district court rejected the Commonwealth's objections as procedurally defective, and you don't challenge that on appeal, so why is Mr. Lee or Mr. Hahn? Mr. Lee. Mr. Lee. Why is Mr. Lee not right, his counsel, that we should review for plain error? Your Honor, the Commonwealth's contention would be that based on the, excuse me, the appellant's contention would be that based on the procedural posture of the case, since we're looking at the constitutional error that was found for a due process clause violation, that we would argue under the Chapman v. California case pursuant to the United States Supreme Court and U.S. v. Larson and U.S. v. Leib that the harmless error standard should prevail. I do understand that the district court did rule that there was a defect in the objections filed by appellants due to a failure to cite an amendment. My question is why should we not review for plain error? I understand what your argument is that we should do the harmless error analysis here, but why should we not review this particular appeal for plain error? That is, there was an error, it was a plain, it affected substantive rights, and if all three of those are met, somehow it affects the integrity of the system. Right, Your Honor. My argument would be that, though I agree it was not raised in the appellant's brief in this matter, that Attorney Schmidt, who was an attorney for appellants at the time, did raise the objection before the district court. I would agree that he did not, the appellants in that matter, did not extensively cite the rulings in the report and recommendation as is required by the rules, but he did provide some citation to those when he raised his objection with regard to Magistrate Judge Carlson's characterization of the evidence in that matter. So I put forth on that ground that we proceed on the harmless error. However, in the alternative, Your Honor, with regard to the plain error, I am also prepared to proceed with argument on that ground as well. All right. Well, why don't you deal with it under plain error for a moment, Your Honor. Yes, Your Honor. With regard to the plain error, I would argue that there was a ruling that did affect substantial rights, and that was Judge Carlson's characterization of the evidence. I know Judge Carlson wrote a very long and well-reasoned report and recommendation that was adopted by Judge Nealon in this matter, and he gave a fairly thorough review to the evidence presented, both with regard to the gas chromatography and the independent evidence that was presented at trial. However, it would be the appellant's contention in this matter that there was plain error because Judge Carlson did not accord significant weight or the weight that should have been accorded to the evidence that did remain in the case. Granted that all the fire science evidence is now out, an appellant would not try to argue against that ruling as there was a full evidentiary hearing held with the fire experts who testified both on behalf of Respondent and Petitioner in that matter. However, the testimony that did remain in the case, some of which was through Fire Marshal Jones, that did not have to do with regard to the spill patterns and alligatoring, which was something that was conceded early on in the case by Respondent's good support. The magistrate judge might have been influenced by the first time that this case appeared before our court, and we made certain assessments and certain rulings. So I want to ask you about one of those things. In that case, the first time that Mr. Lee's case was heard, we said, if new developments in fire science show that the fire expert testimony at Lee's trial was fundamentally unreliable, then Lee would be entitled to federal habeas relief on his due process claim. Isn't that the rule of the case here? If the fire science evidence is found to be unreliable, he's entitled to habeas relief. And, Your Honor, that is correct. That was the standard handed down by this court with regard to the district court. However, the district court did take under advisement another layer of review, and that would be the ample evidence review pursuant to Carls v. Whitley and Albrecht v. Horn. That was the U.S. Supreme Court in a Third Circuit case, which considers despite that, when there was that finding by the district court, the court also considered whether or not there was ample other evidence of guilt that could support the jury's verdict. And that is what I'm contending here today, is that there was ample other evidence of guilt independent of the science that was ruled inadmissible. Wasn't some of the evidence predicated upon the reaction of Mr. Lee to the situation that people observed after the fire? Yes, Your Honor. I couldn't help but wonder, you know, there's cultures and there's cultures. Different people act in different ways. And as I pointed out to my clerk, I never get upset. Now, some people would get upset at things that don't upset me. And somebody would say, look how calm Judge Greenberg was. And I know that I would say, well, that's the way it is. But so in other words, would someone say, well, I should have gotten so upset? I mean, different people act in different ways. And different cultures act in different ways. I mean, what kind of evidence is that? I mean, he wasn't celebrating. He was not, Your Honor. And you're correct, there was some evidence introduced at trial to support the verdict. What was relied upon, however, there was testimony by individuals in the society, on behalf of then-defendant, now Appellee Lee, that dealt with that and put that before the jury, and that was before that jury for consideration. But I think also of some import was the fact and the reaction that the appellee's wife and daughter showed when they arrived on the scene of the fire. The testimony at trial revealed that the appellee's wife arrived on the scene and was physically shaken, had to be escorted away from the fire scene due to the shock of the situation, and the appellee's daughter similarly had to be consoled and was in fact inconsolable after viewing what had happened to her sister at that time. So that evidence was presented before the jury, but there was also evidence to the contrary presented by the defendant. So I would contend, Your Honor, that the jury had a fair record upon which to consider Appellee Lee's behavior when taking that into account and rendering their verdict in this matter. What are we looking for, though, if you take out the fire science evidence? And the gas chromatography. Yeah, if you take out the scientific evidence in total, you're saying that there is still some evidence to support the jury's conviction, would we say beyond a reasonable doubt? I would, Your Honor. That has to be the autopsy report and the demeanor we've been talking about. The coroner's report, Your Honor, the report and testimony from Dr. Malachis. Do you not factor in this phenomenon of jurors giving extraordinary importance to science evidence? When you parade experts before a jury and these experts are testifying with a certain degree of certainty that this is how the fire started, this is what happened, do you not think that jurors give that type of evidence extraordinary value? And now you pull that evidence out, what is left in your case? What is left in your case is this evidence of demeanor, conflicting other types of evidence, and you're saying that that's sufficient beyond a reasonable doubt? That would be my contention, Your Honor, because to Your Honor's point, there was also evidence presented through the coroner and Dr. Malachis, which was also scientific evidence that did survive challenge and is still for consideration by this court and was also considered by the jury. And that evidence did not come under attack, and it had to do with the manner and cause of G. Unley's death. And I would contend to the court, Your Honor, that the testimony by Coroner Allen and Dr. Malachis was very significant with regard to the carbon monoxide level in G. Unley's blood, which was determined to be 9.5 percent by Pocono Medical Center and then a lower amount, 6.1 percent, by Lehigh Valley Hospital. That was testified to by Fire Marshal Jones, Coroner Allen, and Dr. Malachis as being significant and evidence of an individual who would have lived only a short time in a smoke-rich environment, an environment that Appellee Lee testified to was filled with smoke when he himself was moving in and out of the building, bringing it to his own testimony. It really comes down to did Ms. Lee die by a flash fire or by strangulation? Isn't that really pretty much it? And to that point, Your Honor, I believe Dr. Malachis provided the jury at that time with a fairly well-reasoned and thorough explanation of why the strangulation was the more likely cause of death. But they also both acknowledged that the autopsy results were consistent with her dying by a flash fire rather than strangulation. They could be consistent with both, I believe, is what they testified to, but based on Dr. Malachis' opinion and his experience on the testimony before the jury was that should she have succumbed to a flash fire in the scenario described by the defendant at the time, she would have been blown back into the bathroom where she was purported to have been staying at the time when she would have been consumed by a flash fire. How can then we say that the jury could have found the cause of death beyond a reasonable doubt? Your Honor, I would contend that they could rely on the testimony of the fire marshal, the coroner, and Dr. Malachis to that end. I believe another significant going to Judge Ambrose's point with regard to the flash fire versus the strangulation would be the location that the body was found and the significant damage it had suffered. The body was found on the same side of the hallway about two feet down from the bathroom door, which Dr. Malachis testified to was significant with regard to it not being a flash fire that would have consumed this young lady. Did the experts rule out suicide? I'm sorry, Your Honor? Did the experts rule out suicide? The experts did not. However, the testimony with regard to the damage to the body and the carbon monoxide level is what went to ruling out the suicide as the cause of death because there was testimony that if she had survived longer in a smoke-rich environment, there would have been a higher level of carbon monoxide in the blood. So with regard to ruling out suicide, Your Honor, I would contend that we have to consider several factors and put them together with regard to the unlikelihood of the flash fire being the cause of death when we consider the testimony in total, the hemorrhaging, which points to the strangulation, and the location and damage to the body, which points to a deliberately set fire at that location. I see that I'm out of time, Your Honor. Thank you. We'll get you back on the record. Thank you. Mr. Goldberger. May it please the Court, my name is Peter Goldberger, and it's my privilege under a CJA appointment of this Court to represent Hamtak Lee, the appellee here who I have been representing for the last 15 years. Mr. Lee was wrongfully convicted of arson and murder 25 years ago in Monroe County. The District Court carefully followed the law of the case established by the precedent of the prior panel in granting the writ of habeas corpus on due process grounds. After carefully reviewing the facts in light of discovery and a hearing and certainly committed no plain error in doing so, there is no basis to this appeal. There's no basis what? There is no basis for this appeal in law. Could you, Mr. Goldberger, there was a petition filed that apparently lay dormant for five or ten years. Could you explain what happened with that? Yes. Yes, I can. With the Court's permission, I want to say that I stand on our jurisdictional argument. We made it in the brief. The notice of appeal was never filed within the meaning of the District Court's rules which established what it means to file. It was delivered on the 30th day, right, to the Court's office, and they sent it down. The next day they came back. Yes. Really, the whole thing comes down to a difference of $5. They didn't have the authority to send electronically anything over $500. It was $505, so they sent a check instead, but it was actually delivered to the Clerk's office and doesn't delivery equal filing. Delivery equals filing if paper filing is permitted. The District Court's rules prohibit paper filing subject to exceptions which can be granted by the District Court. I don't want to belabor it, but the District Attorney had two opportunities to correct the situation. One was to ask permission to file on paper if they thought they had a reason, and I'm sure it would have been granted, but only the District Court can grant it. Or they could have asked for an extension of time under Rule 45, which I pointed out to them when I filed my motion to dismiss, and they dug in their heels and stood on what they did and invoked the Fills of Appellate Procedure, which don't apply. The District Court had power to help them. This Court has no power to help them and should not. Well, as you know better than I because you've been around here from, what, 75, 76 when you clerked? That's right. That this Circuit tries to get to the merits if it can. I fully understand. And so you're really going under, what, 5A3 as opposed to 5A2. There was a paper filing here. Yes. It was delivered to the clerk's office on the last day, and because of some internal thing, it had to come back from—it wasn't technically— I'm not concerned with how the District Court handled the paper. It's whether they had the right to use paper on their own say-so. Because the local rules require that you file electronically. Right. Unless you have—except for reasonable exceptions. Right, which can be granted only by the District Court. And as this Court has held over and over again in extension of time cases, the rules give that authority to the District Court, not to the Court of Appeals. All right. Why don't you go back to the merits? Okay. So to Judge Fuentes' question on the history of the case. Mr.—to file habeas, you have to have exhausted remedies in the State Court. Typically that's done—the kind of issue—the issue that we are pursuing here and I think we should prevail on here was raised in a post-conviction proceeding in the State Court. Pennsylvania in 1995 passed a statute similar to AEDPA, establishing for the first time as of 1996 a statute of limitations for post-conviction filing. When Mr. Lee first came to our office, it was already the year 2000, when his friends came to our office. And we didn't know what was going on with the case. It looked on the face of it like it might be too late to do anything. But when we checked the docket in this Court of Common Pleas, we found that a pro se post-conviction hearing act petition, as it was then called, had been filed in 1995, which was at a time when there were no statutes of limitations. So it was certainly timely. The Common Pleas Court, which was the trial judge, had ordered the district attorney to file an answer to it, and the district attorney had disobeyed that order and for five years had filed nothing. So there was pending on the docket of the State Court a timely post-conviction proceeding. And Pennsylvania, interestingly, has a very strict statute of limitations rule and a very lenient amendment rule. So we were authorized to amend the pro se timely filing to make the claims, which we have been pursuing ever since. So that's the strange story of what happened. Now, on the merits, the only thing that they have left, they have the possible testimony of the experts relating to the autopsy, Allen and Mihalikas. Yes. They have demeanor evidence that they purported conflicts with Mr. Lee's story. Could you start with the last one? The claim was that he gave significantly different versions of what actually happened. Could you deal with that? Well, that's the Commonwealth's claim. That's viewing it in the light most favorable to themselves, as if this were a direct appeal of a conviction to a court of first instance. But what we have instead is a magistrate who reviewed this record, this whole lengthy multi-volume trial record, including every one of those statements, and described the differences between the statements as trivial and insignificant and described that piece of evidence and all the evidence they're relying on as so-called overwhelming evidence as thin reeds, thin reeds. What were some of the differences that they honed in on? I wish you'd asked my friend that question, but I think it has to do with what Mr. Lee did when he reentered the building after initially fleeing. Where did he look for his daughter? There are things that a person who had just awakened from a dead sleep after being sleepless for a day and found himself in a smoke- and fire-filled room would not likely have a precisely reliable memory of. It means nothing. And the question is not whether a jury could have believed this and not that. That's not the question before this court. The question is either, depending on which quote you take from the prior panel's decision, the absolute entitlement that Judge Flint has already quoted or the balancing rule that my friend from Monroe County quoted and which Judge Carlson went on of after finding the evidence to be unreliable, was there what Albrecht called ample evidence, and which clearly means damning evidence, that a jury would surely have relied on in disregard of the science. We know that that's not the case here. The District Attorney argued in closing that it was the false scientific evidence, what we now know to be the false scientific evidence, that proved Mr. Lee guilty. The jury was invited to convict on the basis of that evidence, and the trial judge in his post-trial motions decision, as I quote in my brief, said, this was a case of equivocal, not overwhelming evidence, and only if the jury believed all the experts could the jury have found the defendant guilty beyond a reasonable doubt, and that was a jury question. I thought the fire science and chemical evidence brought here is very powerful, I think, before a jury. Now, that evidence is out, but evidence involving an autopsy report is also very powerful. True. And Mr. Grinnell says, well, based on that evidence, along with demeanor and the different versions given by Mr. Lee, that might have been sufficient for the jury. There are two things about the autopsy. One is the carbon monoxide, carbon dioxide level. The other is the supposed physical evidence of strangulation. What the carbon dioxide level shows is that Gian died of conflagration rather than of smoke inhalation. That is, because the level was low, she didn't choke on smoke. She died of the burns. That's what it means that the level was 9 rather than 40 to 50. And so, in turn, that means she was near the origin of the fire or was dead before the fire reached her. One of those two things, and the coroner could not say which. She was near the origin of the fire in either of two circumstances. Either she set the fire, that's the suicide, or the fire was an accident that happens to have started at that end of the cabin. Both those theories rule out homicide? And both of those theories rule out homicide. So there is not sufficient evidence of step one for a criminal case here. It is equivocal whether we have an accident or a murder at all. An accident, a suicide, or a murder at all. Now the second issue is was there some evidence of strangulation? This evidence was also weak and equivocal. And as Judge Carlson pointed out, the key indicator of strangulation was absent. And this was brought out at the trial, which is the popping of little blood vessels in the soft tissue of the face. The trachea. Right. So without that, what you have is some marks on the neck that are possibly consistent with pressure from an unknown source and not a hard squeeze. It's not ligature. It's not like you see with a real strangulation case. And again, equivocal in what Judge Carlson collected as the thin reads. Some of the circumstances are very strange in that Mr. Lee actually is the one who, concerned for his daughter and speaking to Reverend, took his daughter to this retreat. Absolutely. And then he's accused of killing her there. Yes. Very peculiar circumstances, but also the idea that the fire starts at like 3 o'clock in the morning, 4 o'clock in the morning, which you wouldn't expect, I suppose, if you wanted to cause harm to somebody you love, presumably. Do you have any thoughts about this idea of the fire starting? Is there any evidence of how the fire actually started? Unfortunately, by the time the discovery was finally ordered, thanks to the remand from the prior panel, the fire debris evidence, that is the remains of the cabin, no longer existed. So our expert was fairly confident that, as in the hundreds of cases that he's examined, he could have told you how this fire started had he been able to examine the floorboards, the ceiling, the glass, the furniture, and the electrical panel. He could have told you, did the fire start in the electrical system? But none of that was available when we finally got the discovery last year. All that was available was two pieces of clothing and a melted jug and glove, and what those showed was not anything about whether the fire was accidental or deliberately set, which is step one to have a crime, but that this other piece of scientific evidence, the gas chromatograms, that initially isn't even the new science issue, it's a different problem, was false. That that testimony was refuted by a replication of gas chromatography that should have produced the same result that the evidence was unequivocally showed at the hearing before Judge Maxfield would have showed, the same result last year that it would have showed 20 years earlier. And what it showed was that what the jury was told about his clothing and its relationship to the hypothetical tool used to start the fire, the jug, was untrue. The same material in the jug was not on his shirt, was not on his pants, what was on his pants was not what was on his shirt, and there was no mixture. Every incriminating detail of that was refuted, and the DA now completely disavows it as false testimony. What exactly was the new scientific methods that discredited the testimony at trial? So the new science is about how you determine a point of origin, how you determine the direction the fire moved, and most importantly the significance of what you find in the ruins of a burned building. So when the wood has crinkled in a certain way, what they call alligatoring, used to be a telltale sign of arson, not true. The glass broke in a certain way in the windows, called crazing, used to be a telltale sign of arson according to the textbooks, not true. You could tell from the temperature of the fire how fast it was moving, and thus whether it was deliberately set, not true. Everything that was taught in textbooks at that time, everything important, turns out not to be true, and how was it shown not to be true? Because a handful of scientists, a handful of fire marshals, who happened also to love science, and some were just college science majors, thought this would be interesting, let's go examine 50 houses that were burned in a California wildfire. The houses we know were burned by accident, and let's pretend we don't know what happened and look at the evidence, and they found all the indicators that their textbooks told them would prove that the houses were burned on purpose by arson. And they went, holy moly, everything you're taught is not true. And they set out to change the rules, and it took them ten years to change the rules of the profession, but they did it. And now it's accepted, universally accepted. It came first in insurance cases, where the first court cases that you see discussing this are insurance cases, and then to criminal cases, and now there's more than 50 exonerations around the country in cases like this, one of them perhaps posthumous on death row in Texas. Thank you very much. Thank you. We have Mr. Brunel. Let me ask you, and you don't have to answer this. If you had a chance to retry, do you have any indication as of today as to whether there actually would be a retrial? I have no standing decision currently, Your Honor. Would you say this fire science evidence that was presented in this case was the centerpiece of the government's case? As Your Honor alluded to earlier, I would certainly be hard-pressed to argue that the jury did not consider that evidence. It was presented through Mr. Pacewicz. But I will contend that the other evidence that I alluded to here today and included in my brief does still provide strong support for what the jury decided. When juries go back and deliberate, Your Honor, it's hard to tell what it is they exactly rely upon or consider when they're in the deliberation room, and I contend that we at the Commonwealth gave them plenty to hang their hat on, so to speak, with regard to a verdict in this case in the form of the other evidence. Your Honor has to question with regard to the statements that the appellants had made issue of, made by the appellee. Significant from the appellant's point of view is that in the first three statements given, that was to fire Marshal Jones, Detective Bortz, and Detective Bortz again, the appellee made no mention of having slipped and fell or any liquid being anywhere within the cabin. That didn't happen until a fourth interview and then the appellee's testimony at trial and her account by Reverend Soome. Additionally, through most of the interviews, there were different accounts of the path that the appellee took through the cabin and where he saw fire first. In the first few accounts, he testified that he awoke to smoke and that was common throughout all of the accounts he gave, but then first saw fire in G.U. Lee's room. Then he contended he didn't see fire at all until he had went back into the cabin for a second time after removing his luggage. And there was discrepancies also with regard to if he fell in the kitchen area where he purportedly said there was liquid or if he fell near the back door as he was leaving. With regard to another issue that came up, Your Honor, with regard to the petechia, the evidence that would otherwise support strangulation, Dr. Mihalikas did testify in his expert opinion that though that is common with regard to strangulation, it is not fatal to not have it in terms of ruling a death homicide by that nature. All right. Thank you very much. Thank you, Your Honor. Thank you to both counsel. Well-presented arguments will take the matter under advisement.